UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA


    - against -

                                                                    **MEMORANDUM AND**
                                                                         **ORDER**
XIUBIN YU,                                                      17-CR-118 (RRM)

                              Defendant.
------------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

     Defendant Xiubin Yu is charged with money laundering and conspiracy to commit

money laundering in violation of 18 U.S.C. § 1956.  (Superseding Indictment (Doc. No. 114).)

Yu now moves for a *Franks* hearing and to suppress all evidence seized pursuant to a search

warrant issued for a business Yu operated in Monterey Park, California.  Yu argues that DEA

Special Agent James Young's affidavit in support of the search warrant contained intentional

misstatements of fact material to the finding of probable cause supporting the warrant.  (Motion

to Suppress (Doc. No. 172) at 6.)  For the reasons below, Yu's motion is denied.

## BACKGROUND

**I.**    **Relevant Facts**

     Defendant Xiubin Yu stands charged with counts of money laundering and conspiracy to

commit money laundering in violation of 18 U.S.C. § 1956, based on her alleged participation in

a scheme to transfer the proceeds of narcotics trafficking within the United States.  (Superseding

Indictment at 1–2.)

     On November 29, 2016, the same day an arrest warrant was issued for Yu, Magistrate

Judge Steve Kim issued a search warrant for a commercial property, (the "Fu Yi Retail Store" or

"Fu Yi"), located at 127A South Garfield Avenue, Suite A, Monterey Park, California.  (*See*

Search Warrant (Doc. No. 177-1); Arrest Warrant (Doc. No. 2).)  DEA Special Agent James Young submitted an affidavit in support of the warrant.  (Affidavit of James Young in Support of the Search Warrant ("Aff.") (Doc. No. 177-2).)

In his affidavit, Agent Young outlines the "hawala" monetary remittance system and how it is commonly used to illegally transfer and launder the proceeds of narcotics trafficking.  (Aff. ¶¶ 7–8.)  Agent Young goes on to detail interactions between Yu and a confidential source ("CS") working with the DEA, as well as undercover DEA special agents ("UCs") and others, in order to explain how he reached the conclusion that Yu's business at 127A South Garfield Avenue was "used to launder monies that are the proceeds of, or are involved in, narcotics trafficking, or are represented to be narcotics proceeds." (*Id.* ¶ 5.)  Early on in the affidavit, Agent Young notes, "The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses."  (*Id.* ¶ 3.)  Agent Young also notes in the affidavit that the CS "has an arrest for violations of federal immigration laws," that the CS "was cooperating for sentencing benefits," and that the CS "has proven over the past three years to be reliable and credible."  (*Id.* ¶ 12.)  The following facts are contained in the affidavit executed by Agent Young.

Young describes Yu as the CEO and CFO of Jerson Trade Company, doing business as "Fu Yi Retail Store," located at 127A South Garfield Avenue.  (Aff. ¶ 11.)  Young states that although Jerson Trade Company is registered with the California Secretary of State as a "wholesale and retail trading company," he believes, "based on [his] experience and training, and knowledge of this investigation . . . that no legitimate business is transacted in [the Fu Yi Retail Store], but rather that it is a front for the money laundering described in this affidavit."  (*Id.*)  The

2

affidavit goes on to describe interactions and transactions involving Yu, the CS, the UCs, and other individuals in September, October, and November 2015, as well as November 2016.

### A.  September 2015

The first transaction detailed in Agent Young's affidavit allegedly took place in September 2015.  Agent Young describes a conversation between the CS and Yu at the Fu Yi Retail Store on September 8, 2015.  (Aff. ¶ 12.)  Agent Young notes that this conversation was "recorded . . . and also relayed to me by the CS during a subsequent debriefing."  (*Id.*)

The CS reported telling Yu that he or she wanted to move money derived from the sale of marijuana from New York to Los Angeles.  (Aff. ¶ 12.)  According to the affidavit, Yu "told the CS that YU can transfer cash from New York to Los Angeles for a 3.5 percent commission of the total amount transferred."  (*Id.*)  Agent Young states that Yu provided the CS with a New York City telephone number, directing the CS to call the number and explain that the call was on behalf of "Mr. Wong."  (*Id.* ¶ 13.)  Yu also gave the CS a phone number with a Los Angeles area code at which to reach her.  (*Id.*)

Agent Young states that on September 9, 2015, an undercover DEA Special Agent called the New York number and in a recorded conversation said he or she was calling on behalf of Mr. Wong.  (Aff. ¶ 14.)  The UC reportedly spoke with a man later identified as Zhan Lin, who gave the UC instructions to meet later that day at a location in Manhattan.  (*Id.*)  The affidavit states that the UC met Zhan Lin at the agreed upon location in Manhattan and that Zhan Lin left with a bag containing $80,000.  (*Id.* ¶ 15.)  Still on September 10, 2015, the CS made a recorded phone call to the Los Angeles number Yu had provided, went to Yu's store, had an audio-recorded meeting with Yu, and exited carrying $77,600.  (*Id.* ¶ 16.)

**B.  October 2015**

The CS and Yu spoke again on October 1, 2015.  Agent Young describes the CS calling Yu at the Los Angeles number she provided during the September 8, 2015, conversation and speaking about transferring $120,000 from New York to Los Angeles.  (Aff. ¶ 17.)  This conversation involved multiple phone calls, but Agent Young notes that only of some of the conversation was recorded because Yu "spontaneously called the CS after the CS made repeated attempts to call her, and while the CS was not in the presence of DEA agents."  (*Id.*)  Yu reportedly told the CS that the $120,000 could be delivered in New York at the same location as the September 9th exchange described above, and confirmed that the same purported associate of the CS would be dropping off the money.  (*Id.*)  Agent Young states that Yu provided the CS with a serial number, which she stated would match the serial number on a dollar bill provided by her associate receiving the $120,000 in New York.  (*Id.* ¶ 18.)  Yu also provided the CS with a different New York City phone number for the person dropping off the money in New York to call.  (*Id.*)

Agent Young states that the UC called the number Yu provided that same day and spoke with Zhan Lin.  (Aff. ¶ 19.)  According to the affidavit, the UC and Zhan Lin agreed on the location in Manhattan at which to meet, and upon meeting, Zhan Lin presented the UC with a one-dollar bill with a serial number that matched the number Yu had provided the CS.  (*Id.* ¶¶ 19–20.)  The affidavit states that Zhan Lin asked the UC "whether the cash consisted of many 'small bills.'"  (*Id.* ¶ 20.)  Agent Young explains, "Based on my training, experience and familiarity with this investigation, I understand that large amounts of cash in small denominations, such as 20-dollar bills, is consistent with street-level drug trafficking."  (*Id.*)  The

affidavit goes on to describe Zhan Lin leaving the car, taking a weighted down plastic bag into a store advertising money transfers, and exiting the store with an empty bag.  (*Id.* ¶ 21.)

On October 5, 2015, Agent Young explains, the CS received $80,000 from Yu at 127A South Garfield Avenue, and Yu told the CS that the balance would be provided two days later. (Aff. ¶ 22.)  On October 7, 2015, the CS reportedly met a woman named Ting Lin, who Agent Young identifies as Yu's daughter, at the rear entrance of 127A South Garfield Avenue, and she provided the CS with $36,400.  (*Id.* ¶ 23.)

The affidavit goes on to detail, among other things, a conversation between the CS and Yu on October 22, 2015, in which the CS described an individual who had 3,000 pounds of marijuana seized by the DEA in Queens, New York.  (Aff. ¶ 24.)  According to Agent Young, Yu "stated that she dealt with [that individual] and had laundered money for [that individual], specifically, '5, 10, or 20 pieces.'"  (*Id.*)  Agent Young explains that he believes this was coded language for "$50,000, $100,000 and $200,000 in United States currency, respectively."  (*Id.*)

Agent Young also states that the CS "discussed laundering $100,000 with Yu in approximately one to two weeks' time, or as soon as the CS sold 'toyma.'"  (Aff. ¶ 25.)  Agent Young states in the affidavit that based on his "training, experience and familiarity with this investigation, as well as a certified translation conducted pursuant to the request of the DEA, [he] understand[s] that 'toyma' refers to marijuana in the Fuzhou dialect of the Chinese language." (*Id.*)  Agent Young goes on to add that Yu "further stated that she has approximately one to two million dollars that she can use to move money from China and that she would charge a 5 percent commission to move money between the United States and China."  (*Id.*)

### C.  November 2015

Agent Young describes another transfer of money involving Yu in November 2015. According to the affidavit, Yu provided the CS with a New York phone number on November 11, 2015.  (Aff. ¶ 26.)  The UC called this number the next day, spoke to Honghai Lin, and agreed to meet at an intersection in Brooklyn at 4:30 p.m. that day.  (*Id.*)  Later, at the agreed-upon location, the UC allegedly provided Honghai Lin with a plastic bag containing $100,000. (*Id.* ¶ 27.)  Agent Young goes on to state that later that day, the CS met with Yu in Los Angeles and collected $98,000 – and that they "discussed going into the marijuana business together." (*Id.* ¶ 28.)

### D.  November 2016

The final transaction described in the affidavit took place in November 2016.  According to Agent Young, on November 15, 2016, Yu provided the CS with a Los Angeles phone number, later connected to Ting Lin.  (Aff. ¶ 29.)  Yu reportedly "instructed the CS to have the CS's New York associate call the [New York] number and coordinate the collection of money in New York."  (*Id.*)  According to Agent Young, Yu "also provided a code phrase . . . to be used by the New York associate to verify and validate the caller."  (*Id.*)

Agent Young states that a UC subsequently called the phone number Yu provided, Ting Lin answered, and after the UC provided the code phrase Yu had given to the CS, the UC and Ting Lin arranged to meet in Brooklyn the next day.  (Aff. ¶ 30.)  Then, on November 16, 2016, as planned, the undercover agent met Ting Lin in Brooklyn and delivered a bag containing $125,000.  (*Id.* ¶¶ 31–34.)  Agent Young states that the UC told Ting Ling that the bag contained an additional $5,000 "because the UC made an additional sale of marijuana earlier that day."

(*Id.* ¶ 34.)  According to Agent Young, the same day as this exchange with Ting Lin, the CS went to 127A South Garfield Avenue and Yu provided the CS with $121,875.  (*Id.* ¶ 35.)

## II.    Motion to Suppress

Yu filed her motion to suppress on November 5, 2019.  (Motion to Suppress.)  Yu argues that Agent Young's affidavit in support of the search warrant contained material misrepresentations of fact and that if these misrepresentations are removed, the affidavit presents "insufficient evidence to provide probable cause that Ms. Yu was engaged in criminal activity." (Memorandum of Law in Support of Defendant's Motion to Suppress ("Mot.") (Doc. No. 172-11) at 2.)

Yu specifically identifies 13 paragraphs in Agent Young's affidavit that she argues contain material misrepresentations of fact: paragraphs 11–16, 20, 24–25, 28–29, 34, and 36. (Mot. at 2–6.)  Yu primarily relies on transcripts of recorded conversations involving Yu, the CS, the UC, and others to argue that Agent Young misrepresented these interactions in his affidavit. (*Id.*)  Finally, Yu contends that these paragraphs containing misrepresentations "are the only ones in which marijuana is spoken of at all."  (*Id.* at 6.)  As a result, Yu argues, "When these misleading statements are taken out of the affidavit, there is no indication of 'specified illegal activities' which are required for probable cause to exist to search Ms. Yu's premises."  (*Id.*)

In response, the government first notes that Agent Young did not rely on recordings of interactions between the CS and Yu in preparing his affidavit, as the CS and Yu spoke in the Fuzhou Chinese dialect, which Agent Young does not speak.  (Response in Opposition to Motion to Suppress ("Opp.") (Doc. No. 177) at 2.)  According to the government, transcripts of the recorded calls and meetings involving the CS, Yu, the UCs, and others were not available until after Agent Young's affidavit was prepared.  (Opp. at 2.)  Instead, the government explains,

Agent Young replied upon "representations from the undercover officers, as recounted by officers involved in the operation and memorialized in reports, concerning their interactions with the defendant's [alleged] co-conspirators in New York City" and "representations the CS made to [Agent Young] directly and reports that memorialized the debriefings of the CS by other law enforcement officers." (*Id.*)  The government goes on to argue that none of the statements identified in Yu's motion are false. (*Id.* at 6.)  And even if they were, the government contends, none of the statements were necessary to the finding of probable cause in issuing the search warrant, and therefore, a *Franks* hearing must be denied. (*Id.*)

In reply, Yu argues that Agent Young misleadingly implied in the affidavit that he had corroborated Yu's purported statements by listening to the recordings of those interactions. (Reply to Response to Motion to Suppress ("Reply") (Doc. No. 178) at 2.)  Yu argues that "the statements of the affiant were knowingly crafted to mislead the Magistrate into believing that the incriminating statements were corroborated by audio tape."  (Reply at 2.)  Yu also reiterates her argument that Agent Young's representation that the store was not a legitimate business, but instead a front for money laundering, raises a "question of fact . . . as to whether the representation . . . was made knowingly or recklessly." (*Id.*)  Finally, Yu once again notes that after the claimed material misrepresentations are removed from Agent Young's affidavit, no evidence remains supporting probable cause. (*Id.* at 2–3.)

## DISCUSSION

## I.    Applicable Law

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Probable cause to

issue a search warrant exists where "the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 304 (S.D.N.Y. 2018) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)), *reconsideration denied*, No. 18-CR-579 (JSR), 2019 WL 1460216 (S.D.N.Y. Jan. 10, 2019).

"There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (quoting *Franks*, 438 U.S. at 171) (alterations in original). Accordingly, "a criminal defendant may challenge the validity of a search warrant . . . only in specific circumstances." *United States v. Lahey*, 967 F. Supp. 2d 698, 708 (S.D.N.Y. 2013). One such circumstance was outlined in the Supreme Court's decision in *Franks v. Delaware*:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To overcome the presumption of validity afforded to warrants and be entitled to a *Franks* hearing, "a defendant must make a *substantial* preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth'; and (2) those misrepresentations or omissions were material, or 'necessary to the issuing judge's probable cause finding.'" *United States v. Nejad*, No. 18-CR-

224 (AJN), 2020 WL 429422, at *4 (S.D.N.Y. Jan. 28, 2020) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)).

"Unsupported conclusory allegations of falsehood or material omission cannot support a *Franks* challenge; to mandate a hearing, the plaintiff must make specific allegations accompanied by an offer of proof." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994); *see also United States v. Levy*, No. 11-CR-62 (PAC), 2012 WL 5830631, at *5 (S.D.N.Y. Nov. 16, 2012) ("[T]o satisfy [the *Franks*] test, a defendant must 'point out specifically the portion of the warrant affidavit that is claimed to be false.'" (quoting *Franks*, 438 U.S. at 171)), *aff'd*, 626 F. App'x 319 (2d Cir. 2015).

"To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003) (quoting *U.S. v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000)). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *U.S. v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (citing *U.S. v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)).

## II.    Entitlement to a *Franks* Hearing

Yu specifically identifies 13 paragraphs in Agent Young's affidavit that she claims contain material misrepresentations of fact. (Mot. at 2–6 (discussing paragraphs 11–16, 20, 24–25, 28–29, 34, and 36).) As explained below, Yu has failed to make the required "substantial

preliminary showing" that any of these paragraphs contains an intentional or reckless misrepresentation of fact material to the probable cause finding. *Nejad*, 2020 WL 429422, at *4.

### A.  Paragraph 11

Yu first argues that Agent Young misrepresented the nature of Yu's business by stating, "[B]ased on my experience and training, and knowledge of this investigation, I believe that no legitimate business is transacted in the [Fu Yi Retail Store], but rather that it is a front for the money laundering described in this affidavit." (Aff. ¶ 11.)  Yu points to the fact that the store was registered with the California Secretary of State, and that it appears to have made food sales to legitimate customers, to argue that Agent Young's statement that "no legitimate business" was transacted at the store was a misrepresentation. (Mot. at 2–3.)

Paragraph 11 of the affidavit discloses that the business subject to the warrant was registered with the California Secretary of State. (Aff. ¶ 11 ("According to records of the State of California, Secretary of State, XIUBIN YU is the Chief Executive Officer, Secretary and Chief Financial Officer of Jerson Trade Company, Inc., doing business as 'Fu Yi Retail Store' and 'Fu Yi Store' (the 'SUBJECT BUSINESS').  According to records of the California Secretary of State, the SUBJECT BUSINESS is a 'wholesale and retail trading company' located at the SUBJECT PREMISES.").)  Agent Young thus forthrightly disclosed one of the facts that Yu contends establishes her business was legitimate.  Even if Yu could argue that this statement was inconsistent with stating that "no legitimate business" was transacted at the store, she cannot not rely on this fact to make the necessary showing that Agent Young intentionally or recklessly misrepresented the legitimacy of her business. *See Nejad*, 2020 WL 429422, at *4.

Yu also points to the fact that her business sold food to argue that Agent Young misrepresented the nature of her business. (Mot. at 2.)  Yet Agent Young's statement that Yu's

store transacted in "no legitimate business" can only be understood in the context of the full sentence, which goes on to claim that Agent Young believed the business to be "a front for the money laundering described in this affidavit." (Aff. ¶ 11.) *Cf. Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991) ("[C]ourts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). It is generally understood that businesses that serve as "fronts" often, if not usually, transact some legitimate business either incidentally or to further obscure their true purpose. Agent Young's statement cannot be reasonably understood to foreclose on the possibility – as Yu apparently contends – that people ever purchased food at Yu's store. Instead, the claim that the business was a front, and did not transact in legitimate business, is reasonably read as an attempt to communicate that any "legitimate" sales were not, by Agent Young's assessment, furthering the store's primary purpose. Yu fails to make a "substantial preliminary showing" that Agent Young's statement that he believed Yu's store transacted in "no legitimate business" was misleading. *Nejad*, 2020 WL 429422, at *4. (Aff. ¶ 11.)

### B. Paragraphs 12–16

Yu also challenges Agent Young's statements in paragraphs 12–16 of the affidavit, which describe an interaction between the CS and Yu that occurred on September 8, 2015. (Aff. ¶¶ 12–15.) Regarding paragraphs 14–16, Yu notes that transcript of the UC's conversation with Zhan Lin, and the transcript of the CS's September 10, 2015, conversation with Yu, do not include information "about the source of the money to be exchanged." (Mot. at 3.) With respect to paragraphs 12 and 13 of the affidavit, Yu argues that the transcript of her conversation with the CS on September 8, 2015, demonstrates that Agent Young misrepresented details of the

conversation in the affidavit, such as Yu's purported instruction to use the name "Mr. Wong," because these statements are not evident in the transcript.  (*Id.*)

To the extent Yu challenges the content of paragraphs 14–16 of the affidavit, this challenge fails.  The affidavit at no point states that the UC or the CS mentioned the source of the money exchanged in these interactions, so Yu does not identify misrepresentations in these portions of the affidavit.  (Aff. ¶¶ 14–16.)

Yu also fails to make a preliminary showing of misrepresentations in paragraphs 12 and 13 of the affidavit.  Yu relies on the transcript of her September 8th conversation with the CS to argue that certain statements reported in the affidavit are not present in the transcript, and are thus misrepresentations.  However, as the government notes in its motion, the transcript reflects that much of "the conversation was significantly unintelligible" on the recording.  (Opp. at 9; Mot., Ex. 2 (Doc. No. 172-2).)  For this reason, Yu's reliance on the transcript to argue that particular details of the CS's description of his conversation are absent from the transcript – specifically the mention of a commission, the transfer of funds, and "Mr. Wong" – is misplaced. Yu cannot rely on a partially unintelligible transcript to make a "substantial preliminary showing" that these details in the affidavit were misrepresentations.  *Nejad*, 2020 WL 429422, at *4.

Yu does identify one statement which can be evaluated based on the transcript: Agent Young's statement that the CS told Yu that the money to be moved from New York to Los Angeles "was derived from the sale of marijuana."  (Aff. ¶ 12.)  Contrary to Yu's argument, however, the transcript supports this claim.  Though the transcript of the September 8th conversation is broken and difficult to follow, the CS at one point appears to say, "I will come over later . . . .  He is handling marihuana."  (Mot., Ex. 2 at 9.)  Immediately after, Yu appears to

reply, "Call him brother." (*Id.*) Yu downplays this exchange in her motion, arguing that this could only constitute evidence that the CS said the money was derived from marijuana sales if the CS was "referring to himself in the third person." (Mot. at 3.) On the contrary, the CS's statement appears wholly consistent with the transaction the affidavit claims the CS arranged with Yu, which involved the delivery to Yu's counterparty *in New York* of cash procured from the sale of marijuana – presumably involving an associate of the CS, as the CS was in Los Angeles at the time.

Whatever the precise meaning of this exchange, it generally supports the affidavit's representation that the CS disclosed the source of the money he sought to transfer to Yu. Moreover, according to the affidavit, the UC subsequently called a New York number Yu provided and successfully arranged a delivery of money in New York City for later that day. (Aff. ¶¶ 14–15.) Whether or not this conversation can ultimately be used to support the government's account of events, Yu fails to make the required "substantial preliminary showing" that the affidavit falsely represented that the CS told her that the money the CS sought to transfer was derived from marijuana sales, or to make such a showing for any other statement in paragraphs 12–16 of Agent Young's affidavit. *Nejad*, 2020 WL 429422, at \*4.

**C. Paragraph 20**

Yu contends that paragraph 20 of Agent Young's affidavit misrepresents the UC's conversation with Zhan Lin on October 1, 2015. According to Yu, the transcript of this recorded conversation shows that Zhan Lin never presented the UC with a one-dollar bill matching the serial number provided by Yu, and that Zhan Lin did not ask whether the cash consisted of "small bills." (Mot. at 3–4; Aff. ¶ 20.)

14

Yu's challenge with respect to the serial number is misplaced.  Yu argues that the affidavit misrepresents the exchange because "[t]here is nothing in the recorded conversations about a serial number."  (Mot. at 3.)  But nothing in the affidavit suggests that Zhan Lin and the UC *spoke* about the serial number on the bill:

> At approximately 5:30 p.m., ZHAN LIN entered the front passenger side of the UC's vehicle, and the vehicle drove away.  ZHAN LIN greeted the UC and provided a one-dollar bill . . . which bore the same serial number [as] provided by YU earlier that day.  After verifying the serial number, the UC stated that Mr. Wong told him/her to drop off "12," meaning $120,000.

(Aff. ¶ 20.)  The affidavit's description of Zhan Lin "provid[ing] a one-dollar bill" before the UC spoke about dropping off the money is wholly consistent with a wordless exchange.  (*Id.*)  And in fact, the government states in its opposition it anticipates that the UC "will testify that Zhan Lin handed him the bill at the beginning of the meeting to verify [the UC] was speaking to the correct person and that [the UC] silently verified the serial number."  (Opp. at 10.)  Whether or not the government ultimately elicits this testimony, nothing in the affidavit implies a verbal exchange regarding the serial number, so Yu cannot rely on the absence of a discussion about the serial number in a recorded conversation to establish a misrepresentation.

The government concedes that other statements in paragraph 20 of the affidavit were incorrect.  First, the government acknowledges "an inconsistency" between the affidavit's description of Zhan Lin's alleged comments about "small bills" and the transcript of this conversation.  (Opp. at 11.)  The affidavit describes Zhan Lin "ask[ing] the UC whether the cash consisted of many 'small bills.'"  (Aff. ¶ 20.)  In contrast, the government acknowledges, the transcript appears to show the UC raising the issue of small bills, stating, "[W]e also have small ones, just like 224," to which Zhan Lin replied, "I bet you don't have many small ones."  (Def. Ex. 4 (Doc. No. 172-4) at 11.)

The government contends that the misstatement related to small bills was "an innocent error" and was "not material to the probable cause determination." (Opp. at 11.) Yu makes no argument that this statement regarding small bills was either an intentional misstatement or that it was material to the probable cause determination, and the Court finds no support for these conclusions either. The government did not contend in the affidavit that Zhan Lin passed the information regarding small bills onto Yu. (Aff. ¶ 20.) Given the other statements in the affidavit regarding Yu's own awareness of the source of the money – for instance, the September 8th conversation detailed in paragraphs 12 and 13 of the affidavit and discussed above, or paragraphs 24 and 25, discussed below – Zhan Lin's purported statement about small bills can be set aside and the remaining portions of the affidavit still sufficiently establish Yu's awareness of the purported source of the funds and her involvement in the marijuana business so as to support a finding of a "fair probability that contraband or evidence of a crime" would be found at Fu Yi. *Pinto-Thomaz*, 352 F. Supp. 3d at 304; *see also Awadallah*, 349 F.3d at 65.

Finally, the government acknowledges that the CS's call with Yu in which she allegedly provided the serial number was not recorded, contrary to a statement in the affidavit. (Opp. at 10; Aff. ¶ 18.) The government contends that this misstatement was not "intentional or reckless." (Opp. at 10.) Yu does not challenge this particular statement in her motion, however, and there is no reason for the Court to conclude that the recording of this statement was material to the probable cause determination underlying the warrant.

### D. Paragraphs 24–25

Yu contends that paragraphs 24 and 25 of the affidavit misrepresent her October 22, 2015, conversation with the CS. According to Yu, the transcript shows that any conversation about an individual involved in a recent DEA drug seizure was "completely driven by" the CS

16

and, contrary to the representation in the affidavit, Yu did not admit to having laundered money for the individual.  (Mot. at 4; Aff. ¶¶ 24–25.)  Yu contends that the affidavit is "doubly misleading" for its "failure to include Ms. Yu's denials of any interest in marijuana."  (Mot. at 4.)  Yu identifies two further discrepancies in affidavit.  First, Yu notes that the affidavit states she used the phrase "5, 10 or 20 pieces," (in what the affidavit says was a reference to $50,000, $100,000, and $200,000), while the transcript shows Yu stating, "The adjustments were just for some pieces.  Ten.  Ten, five."  (Aff. ¶ 24; Mot., Ex. 7 at 13; Mot. at 4.)  Second, with respect to the affidavit's statement that Yu represented "she has approximately one to two million dollars that she can use to move money from China and that she would charge a 5 percent commission" to do so, Yu argues that this conversation was in fact had with her daughter.  (Aff. ¶ 25; Mot. at 4–5.)

The transcript of this October 22, 2015, conversation between the CS and Yu is difficult to follow because, as Yu notes, it appears Yu was having conversations with multiple individuals in her store for a portion of the time she was also speaking with the CS.  (Mot., Ex. 7 (Doc. No. 172-7) at 11–15.)  Nonetheless, the transcript is broadly consistent with the statement in the affidavit that Yu admitted to having laundered money for the individual whose marijuana had recently been seized.  (Aff. ¶ 24.)  In her motion, Yu emphasizes her statement in the transcript that she "has nothing to do with" that individual. (Mot., Ex. 7 at 13.)  However, before this statement, while discussing the same individual, the CS appears to ask Yu, "He did it with you too, right?"  (Mot., Ex. 7 at 4.)  Yu appears to respond, "We did . . . I took things from him, in and out."  (*Id.*)  And later, immediately after Yu says she has nothing to do with the individual, the CS asks whether the individual "ma[d]e some adjustments with [Yu's] help," to which Yu appears to respond, "The adjustments were just for some pieces.  Ten.  Ten, five."  (Mot., Ex. 7

at 13.)  The transcript may be unclear at times, but the question in the instant motion is not whether it could be used to prove that Yu had worked with the individual she and the CS were discussing.  It is Yu's burden to make a substantial showing that the affidavit misrepresented her statements about her involvement with this third individual, and Yu fails to make that showing based on the transcript presented.  *See Nejad*, 2020 WL 429422, at *4.

Similarly, the transcript generally does not support Yu's claim that she disclaimed "any interest" in marijuana.  (Mot. at 3.)  It is true, as Yu emphasizes, that the transcript shows Yu stating she had been "afraid" to get involved in the marijuana business.  (Mot., Ex. 7 at 23; Mot. at 4–5.)  Yet, on at least one occasion, after stating she had been afraid to go into the marijuana business, Yu appears to ask the CS logistical questions about where they could grow marijuana.  Shortly after the CS says, "We can do it together when I find the place," Yu is shown on the transcript asking, "How much do we need to pay for the warehouse?"  (Mot., Ex. 7 at 23.)  Only a highly selective reading of the October 22nd transcript could lead a reader to conclude that Yu was uninterested in going into the marijuana business.  Yu fails to establish a misrepresentation in the affidavit on this basis as well.

Finally, Yu is not entitled to a *Franks* hearing based on the statements "5, 10 or 20 pieces" statement in the affidavit or the statement attributed to Yu that Yu contends was made by her daughter.  (Aff. ¶¶ 24–25; Mot. at 4–5.)  Assuming that the affidavit misrepresented these aspects of the conversation, Yu presents no basis for concluding that either of these misrepresentations were material to the probable cause determination in this case.  The fact that Yu used slightly different numbers than those stated in the affidavit does not call into question Agent Young's claim in the affidavit that Yu was stating in coded language the amounts she laundered for the individual whose marijuana had recently been seized.  (Aff. ¶ 24.)  And while

18

the discrepancy between a discussion with Yu and her daughter is substantial, Yu presents no reason for the Court to conclude that this conversation about overseas money laundering would have been material to the Court's probable cause determination, given the ample evidence, outlined in this Order, that Yu was involved in money laundering between Los Angeles and New York.  Yu thus fails to make a sufficient preliminary showing entitling her to a *Franks* hearing based on either of these alleged misrepresentations.

### E.  Paragraph 28

Yu contests the affidavit's representation in paragraph 28 that she and CS "discussed going into the marijuana business" on November 12, 2015.  (Aff. ¶ 28.)  According to Yu, "these are preliminary discussions about other people that Ms. Yu knows are in the business" and "Ms. Yu makes quite clear that she is not interested herself in going into this business, and further, that she has yet to go into the business."  (Mot. at 5.)

In support of this argument, Yu points to the fact that, after noting that her "relative in Canada keeps urging" her to get into the marijuana business, Yu adds, "I said I didn't dare do it." (Opp., Ex. 3 (Doc. No. 177-3) at 17.)  Yet this statement comes after a lengthy discussion with the CS that appears to show Yu discussing how she and the CS could enter the marijuana business.  In the preceding discussion, Yu appears to state she knows people who could help set up a marijuana business, (*id.* at 10 ("Yes, I've got personnel who knows how to do it.")), discuss how best to secure the electricity necessary to grow marijuana, (*id.* at 9 ("No stealing, but will the power plant ask why your electricity consumption is so large?")), note the difficulties in finding space for growing marijuana, (*id.* at 4 ("It's hard to find a warehouse.")), indicate her interest in working with the CS, (Opp., Ex. 4 (Doc. No. 177-4) at 7 ("How much it is for growers?  In addition, I also have a relative, a friend who is doing it.  If we do it at larger scale,

we can do another one.")), and discuss how she and the CS would divide the earnings, (Opp., Ex. 4 at 7 ("Each of us takes 50%.")).  Whether or not these statements can ultimately be used to show Yu's interest in the marijuana business, the transcript of Yu's recorded conversations with the CS do not demonstrate, as Yu contends, her lack of interest in the marijuana business.  (Mot. at 8.)  Yu has not shown based on the transcripts that paragraph 28 of the affidavit misrepresented her conversation with the CS as a conversation about "going into the marijuana business together."  (Aff. ¶ 28.)

### F.  Paragraph 29

Paragraph 29 of Agent Young's affidavit states that Yu "provided a code phrase" to the CS "to be used by the New York associate to verify and validate the caller."  (Aff. ¶ 29.)  Yu apparently contends that this is a misrepresentation because "this conversation was not recorded, and it is unknown how this information came about."  (Mot. at 5.)  Yet Agent Young does not say that this conversation was recorded.  (Aff. ¶ 29.)  Because Yu fails to provide evidence that this conversation did not occur, and the affidavit does not falsely suggest the conversation was recorded, Yu has failed to identify a misrepresentation in paragraph 29 supporting a *Franks* hearing.

### G.  Paragraph 34

Paragraph 34 of Agent Young's affidavit describes an undercover DEA special agent delivering $125,000 to Ting Lin and stating that the delivery included an additional $5,000 "because the UC made an additional sale of marijuana earlier that day."  (Aff. ¶ 34.)  Yu argues, and the government concedes, that the UC in fact referred to the sale of a "couple pounds of vegetables" – not "marijuana."  (Mot. at 6; Opp. at 15.)  Yu notes that this was not the word used on the transcript, says "there is no indication that this information was even transmitted to Ms.

20

Yu," and that there is nothing in the conversation to demonstrate that Ting Lin understood the code word to refer to marijuana. (Mot. at 6.)

In response, the government first reiterates that Agent Young did not prepare his affidavit based on the transcripts of these conversations and did not have access to the transcripts at the time he submitted this affidavit. (Opp. at 15.) The government then goes on to explain that this was not a misrepresentation because it "anticipates that [the undercover agent] will testify that the term 'vegetable' was a code for marijuana, an assertion corroborated by the fact that very few (if any) vegetables command $2,500 per pound." (*Id.*)

The affidavit does not purport to have quoted the UC in using the word "marijuana," nor does it claim that this coded statement was relayed to Yu. (Aff. ¶ 34.) It is true that the affidavit elides the use of the code word, potentially claiming by implication that Ting Lin understood the meaning of the word. However, as the government notes in its briefing, a common sense understanding of the prices of vegetables would suggest that this likely was a coded statement. (Opp. at 15.) Furthermore, Yu presents no argument as to why the UC and Ting Lin would have been discussing the sale of actual vegetables during a delivery of $125,000. Finally, Yu fails to explain how this statement, which the affidavit does not suggest was relayed to Yu, would have been material to the Magistrate Judge Kim's probable cause determination. Given these facts, the fact that the use of the word "vegetables" was not mentioned in the affidavit is insufficient to constitute a "substantial preliminary showing" that Agent Young made a material misrepresentation in describing the UC's conversation with Ting Lin. *Nejad*, 2020 WL 429422, at *4.

### H.  Paragraph 36

Finally, Yu challenges Agent Young's statement in paragraph 36 of the affidavit that Yu had given the CS "several and different cellular telephone numbers for the CS or the UC to contact." (Aff. ¶ 36; Mot. at 6.)  Yet Yu goes on to argue that she only gave the CS *three* phone numbers – one to contact her and two to contact others.  (Mot. at 6.)  As the government notes, Yu's account is consistent with the affidavit's statement that Yu provided the CS with "several" phone numbers.  The government goes on to dispute the notion that Yu only provided three numbers over the course of the investigation, (Opp. at 15), but this dispute is of no consequence, as the parties agree that Yu provided the CS with "several" telephone numbers as the affidavit contends, (Aff. ¶ 36).[1]  Yu thus fails to identify a material misrepresentation in paragraph 36 that warrants a *Franks* hearing.

### I.  Recording of Statements

In her reply, Yu raises a new argument in favor of suppression.  Yu argues that Agent Young falsely represented that he had corroborated accounts of the CS's conversations with Yu by listening to the recorded conversations.  (Reply at 2.)  As the government acknowledges throughout its opposition, Agent Young did not rely on the recorded statements in preparing the affidavit, but rather on reports of the operation and debriefings of the CS.  (*See, e.g.*, Opp. at 4–6.)  Yu does not contest this claim, but instead argues that the affidavit misleadingly implied that Agent Young *did* use the recordings to corroborate facts reported to him.  Yu points to Agent Young's statement in paragraph 12 of the affidavit as an example:

> Prior to the meeting, the CS was outfitted with an audio recording device.  In a recorded conversation on September 8, 2015, *and also relayed to me* by the CS

---

[1] The affidavit does apparently use Yu's provision of multiple cell phone numbers to contact *others* to support the conclusion that a search of Yu's business would recover cell phones used in the commission of Yu's alleged criminal conduct.  While Yu could be understood to be quibbling with this line of reasoning in the affidavit, she fails to point to a misrepresentation of fact in paragraph 36 that could support a *Franks* hearing in this case.

> during a subsequent debriefing, YU told the CS that YU can transfer cash from
> New York to Los Angeles for 3.5 percent com[m]ission of the total amount
> transferred.

(Aff. ¶ 12 (emphasis added); Reply at 2.)  Yu argues that this statement, and others like it, misleadingly imply that Agent Young had corroborated Yu's purported statements by listening to the recordings.  (Reply at 2.)

Yu's reading of the affidavit is not without merit.  Agent Young's decision to state, for instance, that the conversation was recorded "and also relayed to me" could be read to imply that he had corroborated the CS's report of the conversation.  (Aff. ¶ 12.) Yet the Court disagrees that this potential implication is sufficient to make a substantial showing of "intentional" or "reckless" misrepresentation.  *Nejad*, 2020 WL 429422, at *4.  Agent Young's statement could be read in a number of other, more innocuous ways. For instance, Agent Young's statements in paragraph 12 and elsewhere that the conversations were recorded could be read to lend credibility to the CS's recounting of events.  Presumably a CS would be less likely to misrepresent a conversation that he or she knew could be later translated and reviewed.  Agent Young's statements might also be read to simply be providing the Magistrate Judge with all of the information about the investigation as he remembers it – mentioning that a conversation was recorded might function as just another background fact about the investigation.  These more innocuous readings of Agent Young's affidavit are supported by the fact that, at the start of his affidavit, Agent Young lists the sources of the facts underlying his affidavit, but does not mention the recordings: "The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses."  (Aff. ¶ 3.)

23

But even if the Court were willing to conclude that this paragraph and others like it misrepresented Agent Young's corroboration of the CS's conversations, it is unclear why an implication that Agent Young reviewed the recordings would be material to the probable cause determination. Yu presents no argument on this point. Absent corroboration with the recordings, the CS's account of the conversations with Yu would still be sufficient to support a finding of a "fair probability that contraband or evidence of a crime" would be found in Yu's store. *Pinto-Thomaz*, 352 F. Supp. 3d at 304. Accordingly, even if the Court were to find that Agent Young misleadingly implied that he had corroborated the CS's statements at certain points in the affidavit, "setting aside th[ese] allegedly misleading" implications, the Court finds that Yu has not established the need for a *Franks* hearing in this case. *Salameh*, 152 F.3d at 113.

## CONCLUSION

For the reasons set forth above, Yu's motion for a *Franks* hearing and to suppress evidence seized at 127A South Garfield Avenue, Suite A, Monterey Park, California, is denied.

SO ORDERED.

Dated: Brooklyn, New York
       January 11, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge